UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | | |
|---|---|---|
| **AMBER LOUISE CARTER** | * | **CIVIL ACTION NO. 15-0044** |
| **VERSUS** | * | **JUDGE DOHERTY** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE WHITEHURST** |

**REPORT AND RECOMMENDATION**

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Amber Louise Carter, born April, 1991, filed an application for supplemental security income payments on April 25, 2012, alleging disability as of February 15, 2012, due to diabetes mellitus with neuropathy, asthma, obesity, hernia, GERD and hypertension.

**I. STANDARD OF REVIEW**

The Court limits its review of a denial of disability insurance benefits to two issues: (1) whether the Secretary applied the proper legal standards, and (2) whether the Secretary's decision is supported by substantial evidence on the record as a whole. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Wingo v. Bowen*, 852 F.2d 827, 829 (5th Cir. 1988).

The findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. *Richardson v. Perales*, 402 U.S. 389, 390, 91 S.Ct. 1420, 1422, 28 L.Ed.2d 842 (1971). Substantial evidence is defined as more than a mere scintilla. *Id*., 402 U.S. at 401, 91 S.Ct. at 1427. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id*.

The Court may not, however, reweigh the evidence or substitute its judgment for that of the administrative fact finder. *Cook v. Heckler*, 750 F.2d 391, 392-93 (5th Cir. 1985). If substantial evidence supports the administrative finding, the Court may then only review whether the administrative law judge applied the proper legal standards and conducted the proceedings in conformity with the applicable statutes and regulations. *Id*. at 393.

## II. BURDEN OF PROOF

Disability is defined as " inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). The existence of such disability must be demonstrated by medically acceptable clinical and laboratory diagnostic findings, and the overall burden of proof rests upon the claimant. *Cook*, 750 F.2d at 393.

The Commissioner uses a sequential, five-step approach to determine whether a claimant is so disabled. *Ramirez v. Colvin*, 606 F. App'x 775, 778 (5th Cir. 2015). The steps include: (1) whether the claimant is presently performing substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents the claimant from doing past relevant work; and (5) whether the impairment prevents the claimant from performing any other substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

The burden of proof is on the claimant at the first four steps. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). The burden of proof shifts to the Commissioner at the fifth step to establish the existence of other available substantial gainful employment that a claimant can

perform. *Fraga v. Bowen*, 810 F.2d 1296, 1301-02 (5th Cir. 1987). If the Commissioner identifies such employment, the burden shifts back to the claimant to prove that he could not perform the alternative work identified. *Id*. at 1302. Throughout the process, the ultimate burden of establishing disability remains with the claimant. *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983).

### III. ANALYSIS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability.

In fulfillment of Fed. R. Civ. P. 52, I find that the Commissioner's findings and conclusions regarding claimant's disability is supported by substantial evidence, based on the following:

### A. Medical Evidence

Claimant chiefly complains of problems related to diabetes and asthma. She was treated primarily at Abbeville General Hospital ("AGH") for multiple conditions, including hyperglycemia, sores and skin infections, rashes, respiratory infections, morbid obesity, foot pain, leg swelling and pain, right thumb pain, and wrist pain.

On August 16, 2011, Dr. Ariadne A. Gauthier observed that she had diabetes mellitus Type II under unclear control, and that she did not check her blood sugars. (Tr. 285). She noted on September 29, 2011, that claimant had bought diabetes socks, but not compression stockings as recommended. (Tr. 271). Her assessment was venous insufficiency with bilateral lower

3

extremity swelling and peripheral neuropathy. (Tr. 273). Claimant could not afford Neurontin, so Dr. Gauthier gave her Elavil.

On May 24, 2012, claimant presented with swelling and pain in the right lower extremity. (Tr. 444-45). The diagnosis was pedal edema. (Tr. 446).

Claimant was also treated at University Medical Center ("UMC"), a state charity hospital, for various complaints, including sinus infections, asthma, and anxiety, (Tr. 319-39). The assessment on September 9, 2011, was controlled type II diabetes, obesity, dyslipidemia, anxiety and asthma. (Tr. 328). A pulmonary function analysis taken on October 24, 2011, was normal. (Tr. 324-27).

On February 16, 2010, claimant presented to the emergency room of Our Lady of Lourdes Hospital ("Lourdes") with chest pain, elevated blood sugars and edema in her feet. (Tr. 348). She stated that she had not been following a good diabetic diet, but was taking her medication. The assessment was chest wall pain and hyperglycemia. (Tr. 350).

On February 19, 2012, claimant presented to Lourdes for complaints of heart racing and high blood sugar. (Tr. 342). The assessment was hyperglycemia and palpitations. (Tr. 342).

On February 28, 2012, claimant presented at AGH with feeling tired and week, elevated blood sugars, and leg swelling and pain. (Tr. 524). Dr. Gauthier noted that she had repeatedly instructed claimant to use compression stockings for her lower extremity swelling and pain, but she had yet to use them. The assessment was uncontrolled diabetes mellitus Type II, for which Dr. Gathier prescribed NPH insulin, 10 units subcutaneous twice daily, and uncontrolled asthma, mild, persistent, for which she increased Advair. (Tr. 526). Dr. Gauthier again advised claimant to put the compression stockings on in the morning after elevating her legs for 10 minutes.

Claimant was seen on March 16, 2012, for cellulitis and abscess of the right axilla. (Tr. 520). Both had completely resolved on March 28, 2012. (Tr. 517). Her diabetes had improved, but was still uncontrolled. Dr. Gauthier increased claimant's NPH insulin to 25 units.

On May 1, 2012, Dr. Gauthier wrote that as a result of claimant's diabetic neuropathy, she was no longer able to continue to work at her current job, as it required her to be on her feet for approximately eight to 10 hours per day. (Tr. 615). She noted that claimant was actively looking for a job at which she would mostly sit behind a desk, or be able to stay off of her feet as much as possible.

On June 2, 2012, claimant presented with leg pain. (Tr. 511). She stated that she had worn her compression stockings for one and a half weeks, but the tingling, numbness and sharp pain persisted. She reported that she had gone down on the NPH insulin to 20, stating that she did not get a lunch break at work until after six or seven hours of straight work. Dr. Gauthier advised her to take insulin as directed and not skip meals. (Tr. 513). She increased claimant's Neurontin to 600 mg. three times daily, and encouraged her to continue to use the compression stockings when she worked long hours.

On June 15, 2012, claimant's blood sugars had significantly improved, and she was being compliant with her medication. (Tr. 507, 509). Dr. Gauthier changed claimant's medication to Lyrica because she was symptomatic on Neurontin. (Tr. 509).

On July 7, 2012, claimant underwent a consultative examination with Dr. Jacques Courseault, at which time she complained of asthma, abdominal hernia, GERD, diabetes and diabetic neuropathy. (Tr. 454). She reported blood sugars in the 200s with medication; burning, numbness and tingling in her hands and feet, and weight loss. She stated that her GERD was

mostly well-controlled with medication.  During childhood, she had undergone surgery for a hiatal hernia.  She had rare asthma attacks and no shortness of breath.

Claimant reported that she could sit for 35 minutes and stand for only 10 minutes at times because of burning and swelling in her feet.  She completed activities of daily living and house maintenance activities.  She could climb 15 to 20 stairs and ambulate two blocks, but was occasionally limited to a half block.  She wore glasses.

On examination, claimant's blood pressure was 122/70, height was 5 feet 4 inches, and weight was 235 pounds.  (Tr. 455).  Respiratory, cardiac, GI and musculoskeletal exams were normal.  (Tr. 456).  She was able to rise from a sitting position without assistance, stand on tiptoes, heel and tandem walk, and bend and squat without difficulty.

Grip strength was 5/5 with adequate fine motor movements, dexterity and grasp.  Claimant had no edema, cyanosis, or erythema of the extremities.  Skin was normal.  Mental exam was normal.  Motor exam revealed good tone and 5/5 strength.

Claimant had positive Hoffman's sign[1] on the left, +3 bilateral patella and +2 bilateral Achilles reflexes.  She had an L5 sensory deficit to light touch.

Dr. Courseault's diagnoses were diabetes Type II, diabetic neuropathy, asthma, GERD and hiatal hernia.  He opined that claimant would able to sit, walk and/or stand for a full workday, lift/carry objects without limitations, hold a conversation, respond appropriately to questions, and carry out and remember instructions.  (Tr. 457).

---

[1] 1. in latent tetany mild mechanical stimulation of the trigeminal nerve causes severe pain;2. flexion of the terminal phalanx of the thumb and of the second and third phalanges of one or more of the fingers when the volar surface of the terminal phalanx of the fingers is flicked.  *Stedmans Medical Dictionary* 819420 (2014).

Dr. Timothy Honigman, the Disability Determinations Services ("DDS") physician, completed a Residual Functional Capacity ("RFC") Assessment on July 28, 2012, in which he found that claimant could occasionally lift and/or carry 50 pounds and 25 pounds frequently; stand/walk and sit about six hours in an eight-hour workday; occasionally climb ramps/stairs and ladders/ropes/scaffolds; frequently crouch and crawl, and avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation due to asthma. (Tr. 69-70).

On August 16, 2012, claimant's hemoglobin A1C improved from 10.2 to 7.8 (normal 4.5-6.2). (Tr. 500, 502). She complained that Lyrica made her drowsy and caused balance problems. (Tr. 502). She also complained of insomnia. Dr. Gauthier's impression was diabetes mellitus Type II, improved but still uncontrolled, polyneuropathy, and asthma, controlled. (Tr. 502-03).

On September 14, 2012, claimant was seen for high blood glucose and numbness in her hands and feet. (Tr. 495). She had a follow-up appointment for lab results on September 24, 2012, at which time the assessment was insulin-dependent Type II diabetes under poor control. (Tr. 492-94). She was referred to the dietitian and to podiatry for diabetic foot care.

On October 4, 2012, claimant presented with complaints of bilateral leg pain. (Tr. 464). She admitted to blood sugars in the 500s five days prior, which had improved over the last couple of days. She was counseled on a low sodium diet. (Tr. 467). Dr. Gauthier increased her dosage of Lyrica, and refilled her prescription for Tramadol for severe leg pain.

On January 11, 2013, claimant complained of elevated blood sugars. (Tr. 618). Her glucose level was 500. (Tr. 621). Her diabetes was uncontrolled. (Tr. 621). Dr. Gauthier increased her morning NPH to 40 units, and evening NPH to 15 units.

Claimant complained of bilateral leg swelling and pain on February 11, 2013.  (Tr. 623).  Dr. Gauthier noted that she was not properly using the compression stockings.  Claimant stated that she did not go to see the podiatrist because of costs issues.

Dr. Gauthier opined that claimant's lower extremity pain and edema was likely multi-factorial, including venous insufficiency, morbid obesity, pes planus (flat feet) and inappropriate use of compression stockings.  (Tr. 626).  She instructed claimant again on how to properly use compression stockings, and prescribed Pamelor.

On April 8, 2013, claimant reported improvement in her glucose readings after her recent increase in insulin.  (Tr. 637).  She was waiting for a Protonix prescription for reflux/hiatal hernia from the Patient Assistance Program ("PAP").  (Tr. 637, 640).

On May 10, 2013, claimant complained of anxiety, tachycardia and chest pain.  (Tr. 642).  She had received a prescription for doxycycline for respiratory problems, but had only filled a partial prescription and did not complete her full antibiotic course.  On examination, she had trace edema.  (Tr. 646).  Dr. Gauthier instructed her to finish her antibiotic course, and educated her on the development of antibiotic resistance by not completing her antibiotics prescription as indicated.

On July 9, 2013, claimant reported continued foot and bilateral knee pain.  (Tr. 648).  She was no longer taking Lyrica because of drowsiness and loss of balance.  She reported that she was not taking Propanolol as prescribed for tachycardia because her blood pressure was low at times.  (Tr. 648, 655).  Her diabetes was uncontrolled.  Dr. Simmie Soileau noted that claimant was supposed to wear bilateral compression stockings, which she did not do.  (Tr. 651).

On August 2, 2013, claimant reported that she did not take her evening Humulin when her bedtime glucose was in the 120s or lower. (Tr. 655). Her peripheral neuropathy pain was improved with Tramadol. Her AIC, at 7.7, was improving. (Tr. 660). Dr. Lanminh Pham increased her morning dose of Humulin to 52 units, and kept her evening dosage at 25 units, and instructed her to keep a glucose log. (Tr. 655, 661).

On September 20, 2013, claimant had not brought her blood sugar log. (Tr. 664). She was still waiting to get her lantus from the PAP program. Her diabetes was uncontrolled. (Tr. 667). Dr. Pham restarted her on Metformin and encouraged her to keep a blood sugar log.

### B. Hearing Testimony

At the hearing on May 15, 2013, claimant testified that she was 5 feet 4 inches tall, and weighed 244 pounds. (Tr. 38). She had a driver's license and drove when able. She had completed the 11th grade.

Claimant had past work experience at a nursing home and at fast food restaurants. (Tr. 49-50). She said that she had lost some jobs because of her confusion from blood sugar fluctuations and foot pain from neuropathy. She stated that she had tried babysitting for a family member, but would get too confused to take care of the children. (Tr. 51).

Regarding complaints, claimant reported that she had pain and dizziness from diabetes, pain and swelling in her legs, feet and hands from neuropathy, and shortness of breath and shakiness from asthma. (Tr. 38-39, 44, 54). She testified that she had applied for jobs, but no one would hire her because of her symptoms. (Tr. 38-39). She also complained that her medications made her drowsy or sleepy. (Tr. 39-40).

Claimant stated that she saw Dr. Gauthier at least every three months for diabetes and other health problems. (Tr. 40). She reported that Dr. Gauthier had recommended a specialist, but she could not afford one. (Tr. 51). She testified that for relief, she put on her compression stockings, elevated her feet and took Lyrica. (Tr. 45-46).

Regarding activities, claimant stated that she did a little housework on good days. (Tr. 41-42). She said that she had good days two to three days a week. (Tr. 42). She reported that she left the house about two to three times per week to visit her aunt and cousins, go to the store or the park. (Tr. 42-43).

Claimant's mother, Belita George, testified that claimant had difficulty controlling her blood sugar levels. (Tr. 55). She reported that claimant attended diabetic classes, joined Curves, and walked on a treadmill to improve her condition. She said that she helped her daughter pay for medications, but was not able to afford specialists. (Tr. 56, 57).

Ms. George stated that claimant's problems from diabetes included weight fluctuations, sores and rashes, itching, confusion and eyesight problems. (Tr. 57). She testified that she observed claimant's problems at least four to seven times per week. She reported that claimant's foot pain, leg swelling and hand problems prevented her from returning to work. (Tr. 58).

After the witnesses' testimony, the ALJ posed a hypothetical to the vocational expert ("VE"), Wendy P. Klamm, in which she asked her to assume a claimant who was limited to light work; could occasionally climb and have only occasional exposure to fumes, odors, dust, gases and poor ventilation because of asthma. (Tr. 60). In response, the VE testified that claimant could work as a small products assembler, of which there were approximately 3,070 jobs statewide and 225,630 nationally; cashier, of which there were 21,150 jobs statewide and

1,142,765 nationally, and cafeteria attendant, of which there were 865 jobs statewide and 74,775 nationally. (Tr. 60-61). When the ALJ changed the hypothetical to assume a claimant who could perform sedentary work, Ms. Klamm testified that she could work as a food and beverage order taker, of which there were about 160 jobs statewide and 19,230 nationally; information clerk, of which there were 1,240 jobs statewide and 86,240 nationally, and parimutuel ticket checker, of which there were 990 jobs statewide and 71,345 nationally. (Tr. 61).

Claimant's attorney posed a hypothetical in which he asked Ms. Klamm to assume a claimant who was limited to light work and required unscheduled breaks three times a week lasting 30 to 60 minutes due to blood sugar fluctuations. In response, the VE testified that she would not be able to maintain employment. When the attorney changed the hypothetical to limit a claimant to light work who was unable to maintain concentration, persistence and pace for 10% or four hours out of a 40-hour workweek, Ms. Klamm responded that she would not be able to maintain employment. (Tr. 62).

## C. Argument

Claimant argues that the ALJ failed to account for her non-exertional impairments, including frequent lower extremity swelling requiring elevation and episodes of confusion, dizziness and weakness caused by unpredictable blood sugar level changes, in assessing her residual functional capacity; consequently, the ALJ's RFC assessment was reached through the application of improper legal standards and is not supported by substantial evidence.

In determining claimant's RFC, the ALJ cited the report from her treating physician, Dr. Gauthier, who stated that as a result of claimant's diabetic neuropathy, she was no longer able to continue to work at her current job, as it required her to be on her feet for approximately 8 to 10

hours per day. (Tr. 22, 615). Dr. Gauthier further noted that claimant was actively looking for a job at which she would mostly sit behind a desk, or be able to stay off of her feet as much as possible. The ALJ gave Dr. Gauthier's assessment great weight in determining that claimant had the RFC to perform sedentary work.

It is well established that the opinion of a treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995). A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence." *Newton*, 209 F.3d at 455 (citing 20 C.F.R. § 404.1527(d)(2)).

Good cause for abandoning the treating physician rule includes disregarding statements by the treating physician that are brief and conclusory, not supported by medically accepted clinical laboratory diagnostic techniques, or otherwise unsupported by evidence. *Leggett*, 67 F.3d at 566; *Greenspan*, 38 F.3d at 237.

Here, the ALJ observed that claimant's treating physician did not restrict the claimant from working. Additionally, she gave great weight to the opinion of the consultative examiner, Dr. Courseault, who found that claimant would able to sit, walk and/or stand for a full workday, lift/carry objects without limitations, hold a conversation, respond appropriately to questions, and carry out and remember instructions. (Tr. 23, 457). No physician who examined claimant pronounced her disabled. Thus, the ALJ's determination is supported by substantial evidence.

*Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995); *Harper v. Sullivan*, 887 F.2d 92, 97 (5th Cir. 1989) (substantial evidence supported ALJ's finding that claimant's subjective symptomology not credible when no physician on record stated that claimant was physically disabled).

Additionally, the ALJ found that claimant's statements concerning the intensity, persistence and limiting effects of her symptoms were not fully credible. (Tr. 24). She noted that claimant's daily activities were not limited to the extent one would expect, given her complaints of disabling symptoms and limitations.

In her Function Report and at the hearing, claimant reported that she was able to attend to her personal needs with occasional assistance, prepare simple meals, wash dishes, iron, do laundry, drive, shop, walk, handle money, read the Bible, attend church, go to the park and visit with family and friends. (Tr. 42-43, 183-86). It is appropriate to consider the claimant's daily activities when deciding the claimant's disability status. *Leggett*, 67 F.3d at 565. Thus, the ALJ's credibility determination is entitled to great deference. *Newton*, 209 F.3d at 458.

Further, the ALJ noted that claimant had not generally received the type of medical treatment one would expect for a totally disabled individual. She observed that while claimant testified that she could not afford additional medical care, treatment was available through the State's charity hospitals and clinics. (Tr. 24-25). In the Fifth Circuit, the rule is that if the claimant cannot afford the prescribed medical treatment or medicine, *and can find no way to obtain it*, the condition that is disabling in fact continues to be disabling in law. (emphasis added). *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987).

13

In this case, the record reflects that claimant has been treated at University Medical Center, which is a facility for indigent patients, and had applied for medications through the Patient Assistance Program. (Tr. 255, 319-39, 637, 640, 642, 664). In fact, Dr. Gauthier noted that claimant was treated for free at UMC and could apply at AGH for a sliding fee scale. (Tr. 285). Additionally, Dr. Gauthier tried switching to more affordable medications. (Tr. 273, 661). Thus, as evidenced by the voluminous medical records, claimant has found a way to obtain necessary medical treatment.

The ALJ further noted that if claimant's condition was not severe enough to motivate her to seek additional treatment, particularly when treatment was available, it was difficult to a accept a conclusion that her impairments were disabling. (Tr. 24-25). It is well established that the ALJ is not precluded from relying upon the lack of treatment as an indication of nondisability. *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990); *Rautio v. Bowen*, 862 F.2d 176, 179 (8th Cir. 1988) (failure to seek aggressive treatment and limited use of prescription medications is not suggestive of disabling condition).

Additionally, the ALJ noted that records from Abbeville General Hospital indicated that her diabetes appeared to be improving significantly with medication. (Tr. 25). If an impairment reasonably can be remedied or controlled by medication, treatment or therapy, it cannot serve as a basis for a finding of disability. *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988); *Lovelace*, 813 F.2d at 59.

However, as the ALJ noted, claimant had not been entirely compliant in following treatment recommendations. The record confirms that claimant had been noncompliant in repeatedly failing to wear compression stockings as directed, following a diabetic diet, checking

her blood sugars, and taking medications as prescribed.  (Tr. 25, 271, 285, 348, 511, 524, 626, 642, 651, 655).  It is well established that failure to follow prescribed medical treatment precludes an award of benefits.  20 C.F.R. § 416.930(a), (b); *Johnson v. Sullivan*, 894 F.2d 683, 685, n. 4 (5th Cir. 1990).

Moreover, the ALJ noted that claimant showed no evidence of pain or discomfort while testifying at the hearing.  (Tr. 25).  It is well established that the absence of objective factors indicating the existence of severe pain -- such as limitations in the range of motion, muscular atrophy, or impairment of general nutrition – can justify the ALJ's conclusion.  *Hollis v. Bowen*, 837 F.2d 1378,1384 (5th Cir. 1988).

Claimant also argues that the ALJ failed to account for her unpredictable blood sugar level fluctuations which caused episodic confusion, dizziness and weakness, requiring her to take unscheduled breaks.  She asserts this error caused harm in light of the VE's testimony that excessive unscheduled breaks or the inability to maintain necessary concentration would preclude her from being able to maintain employment.

The ALJ noted that while claimant claimed that she needed frequent breaks, none of her treating physicians had recommended additional breaks or put any limits on her regarding the alleged side effects of her medications.  (Tr. 26).  It is well established that the  ALJ is not bound by VE testimony which is based on evidentiary assumptions ultimately rejected by the ALJ.  *See Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir.1985); *Bayer v. Colvin*, 557 F. App'x 280, 287 (5th Cir. 2014).  As the ALJ's determination is supported by the evidence, it is entitled to deference.

## IV. CONCLUSION

Based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.** *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).

Signed this 7th day of March, 2016, at Lafayette, Louisiana.

UNITED STATES MAGISTRATE JUDGE

COPY SENT:

DATE: 3/7/2016
BY: EFA
TO: RFD
cg